IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ALIA CARTER,

               Plaintiff,

   v.

EUREKA MULTIFAMILY GROUP,

               Defendant.

2:22-CV-01429-CCW

## OPINION

Plaintiff Alia Carter claims that her former employer, Eureka Multifamily Group, discriminated against her on the basis of her race (African American) by altering her job duties, placing her on paid leave, and ultimately terminating her, and that Eureka retaliated against her for engaging in protected activity, all in violation of Title VII of the Civil Rights Act and Title 42, U.S.C. § 1981. Eureka has moved for summary judgment on all claims. ECF No. 30. For the reasons that follow, the Court will grant in part and deny in part Eureka's Motion.

### I.     Material Facts

The following facts are drawn from the parties' consolidated factual statements and responses, which appear at ECF No. 45, and are undisputed unless otherwise noted.[1]

Plaintiff Alia Carter is a former at-will employee of Eureka Multifamily Group. ECF No. 45 at DSMF ¶ 17. Eureka buys, renovates, and manages apartment communities, including 23 low-income affordable housing communities. ECF No. 45 at DSMF ¶¶ 2, 4. Regional property

---

[1] The parties used somewhat confusing numbering, because Ms. Carter's counterstatement of facts re-starts at paragraph number 1. For clarity, the Court will use DSMF and a paragraph number when referring to Defendant's factual statements within ECF No. 45, and it will use PSMF and a paragraph number when referring to Plaintiff's counterstatement of material facts within ECF No. 45.

managers oversee multiple properties within specific regions.  ECF No. 45 at DSMF ¶ 6.  On June 21, 2021, Eureka hired Ms. Carter, who is African American, as the regional property manager for six affordable housing apartment communities in Pennsylvania and Ohio, including Greenbelt Place.  ECF No. 45 at DSMF ¶ 8.  As regional property manager, Ms. Carter was accountable for the operations of the properties within her portfolio.  ECF No. 45 at DSMF ¶ 15.  Ms. Carter understood that it was critical that her properties pass inspections by the United States Department of Housing and Urban Development ("HUD") Real Estate Assessment Center ("REAC").  ECF No. 45 at DSMF ¶ 22.  If her properties failed their REAC inspections, Eureka risked losing its federal funding for those properties.  ECF No. 45 at DSMF ¶ 22.  All six of Ms. Carter's properties passed their REAC inspections in 2019,[2] before she worked for Eureka.  ECF No. 45 at DSMF ¶ 25.

In the fall of 2021, federal and city officials notified Eureka of property condition issues at the Greenbelt property.  ECF No. 45 at DSMF ¶ 39.  At the time of the notice, Ms. Carter was spending approximately 70 percent of her time at Greenbelt as opposed to her other properties.  ECF No. 45 at DSMF ¶ 40.  On October 4, 2021, Ms. Carter led Greenbelt's REAC inspection, which the property failed.  ECF No. 45 at DSMF ¶ 43, PSMF ¶ 62.  Her other properties also failed their REAC inspections.  ECF No. 45 at DSMF ¶ 43.  The parties, however, dispute why Ms. Carter's properties failed their inspections.  Ms. Carter contends the properties had serious issues and were in bad condition when she was hired in late June 2021, and that she attempted to fix those issues and did everything she could to prepare for the REAC inspections.  ECF No. 45 at DSMF ¶¶ 24, 31, 33, 35, 36, 38, 43, 53, 60.  Eureka asserts that the properties failed their REAC inspections because Ms. Carter mismanaged the properties in a variety of ways.  ECF No. 45 at

---

[2] HUD paused REAC inspections in 2020 due to the COVID-19 pandemic;  therefore, the 2019 REAC inspections were the most recent inspections prior to Ms. Carter's employment.  ECF No. 45 at DSMF ¶ 26.

DSMF ¶¶ 31, 33, 35, 36, 38, 51, 53, 60.   The parties agree that Ms. Carter did not appeal Greenbelt's REAC inspection failure.   ECF No. 45 at DSMF ¶ 44, PSMF ¶ 69.

On October 6, 2021, the owner of Eureka, Rene Campos, traveled to Toledo, Ohio to inspect the Greenbelt property in preparation for meetings with HUD and city officials.   ECF No. 45 at DSMF ¶¶ 3, 45.   That night, he had dinner with Ms. Carter.   ECF No. 45 at DSMF ¶ 47.   Ms. Carter contends, but Eureka disputes, that during dinner, Mr. Campos "said that in the past he's been accused of being a racist because he believed that having the same race of the person that oversees the property to be the same race of the people of the property.   He said he believed in that because then there's no misunderstanding."   ECF No. 45 at DSMF ¶ 47, PSMF ¶ 73.   On the morning of October 7, 2021, the parties agree that Mr. Campos and Ms. Carter's supervisor, Stephanie Jeter, entered several vacant Greenbelt apartments, and Ms. Jeter was disappointed by the state of the units.   ECF No. 45 at DSMF ¶¶ 48–50.   Mr. Campos asked Ms. Carter, in front of Ms. Jeter, how much time Ms. Carter had spent preparing Greenbelt for its REAC inspection, and Ms. Carter responded that she had spent the last three months almost solely at Greenbelt fixing the property.   ECF No. 45 at DSMF ¶ 52.   That afternoon, October 7, 2021, Mr. Campos, Ms. Jeter, Ms. Carter, Ms. Carter's supervisee Ms. Jessica Incorvaia, HUD officials, and city officials performed a property walk of Greenbelt, during which Mr. Campos was embarrassed about the state of the property.   ECF No. 45 at DSMF ¶¶ 42, 54.   During this meeting, the officials explained that Eureka needed to have an onsite management representative at Greenbelt five days a week until the property was stabilized.   ECF No. 45 at DSMF ¶ 56.   Ms. Carter asserts that after this meeting, Ms. Jeter told her that Ms. Carter would need to be the "face" of Greenbelt.   ECF No. 45 at DSMF ¶ 57.   On October 8, 2021, Ms. Carter and Mr. Campos attended a community meeting hosted by the City of Toledo, during which multiple Greenbelt residents expressed complaints

about Greenbelt's conditions, and Campos was embarrassed and frustrated to hear the residents' descriptions of the property and their claims that Eureka did not care about its residents. ECF No. 45 at DSMF ¶ 59.

On October 7 and 8, 2021, Mr. Campos, Ms. Jeter, and Eureka's Director of Human Resources Jeni Sumbera considered whether to replace Ms. Carter. ECF No. 45 at DSMF ¶ 60. Eureka contends, and Ms. Carter disputes, that the reason they were considering replacing her was "overwhelming poor performance across all of her properties." ECF No. 45 at DSMF ¶ 60. Ultimately, however, Mr. Campos and Ms. Jeter determined that Ms. Carter should focus her efforts on Greenbelt. ECF No. 45 at DSMF ¶ 61. Eureka contends that the required focus on Greenbelt was a temporary request until Greenbelt was no longer in crisis, but Ms. Carter disputes that her "assignment" to Greenbelt was temporary. ECF No. 45 at DSMF ¶ 61. The parties agree that Regional Property Managers, including Ms. Carter, are ultimately responsible for the operations of the sites within their portfolios, and at times are expected to fill in for Property Managers of a particular property. ECF No. 45 at DSMF ¶ 62. The parties agree that Eureka believed Ms. Carter was the best suited person to focus on the Greenbelt property. ECF No. 45 at DSMF ¶ 63.

On October 14, 2021, Eureka advised Ms. Carter that it had hired Rebecca Kuchta as a Floating Regional Property Manager, and she was to begin work on October 25, 2021. ECF No. 45 at DSMF ¶¶ 76, 77, 94. Ms. Carter alleges that during this meeting, Ms. Jeter for the second time said that Ms. Carter would be the "face" of the Greenbelt property. ECF No. 45 at DSMF ¶ 79. After the meeting, Ms. Carter was informed that she would focus on Greenbelt while Ms. Kuchta would handle Ms. Carter's other properties. ECF No. 45 at DSMF ¶ 93. On October 22, 2021, Ms. Jeter emailed Ms. Carter, reiterating that Ms. Carter would focus solely on Greenbelt.

ECF No. 45 at DSMF ¶ 93, PSMF ¶ 156.  While Eureka contends that it only temporarily assigned Ms. Kuchta to Ms. Carter's non-Greenbelt properties, ECF No. 45 at DSMF ¶¶ 80, 93, Ms. Carter asserts that Eureka "stripped" her of these non-Greenbelt properties and gave them to Ms. Kuchta, ECF No. 45 at DSMF ¶¶ 78, 80, 93, PSMF ¶ 163.

Ms. Carter was expected to be present at Greenbelt four days per week.  ECF No. 45 at PSMF ¶ 158.  Ms. Carter's home was 240 miles, or a 3.5 drive, from Greenbelt.  ECF No. 45 at PSMF ¶ 159.  Although the parties agree that Ms. Carter's job previously required some site visits, Ms. Carter contends that the sole focus on Greenbelt significantly increased the amount of time she was required to be there.  ECF No. 45 at PSMF ¶¶ 158–162.

On October 25 and 26, 2021, Ms. Carter was not physically present at Greenbelt.  ECF No. 45 at DSMF ¶ 96.  On October 29, 2021, Plaintiff attended a Halloween party at Greenbelt.  ECF No. 45 at DSMF ¶ 99.  That same day, Ms. Carter, through her attorney, sent a letter to Eureka, alleging race discrimination, because Ms. Jeter had told her "that she would be officially managing the Green Belt Place [sic] exclusively and would serve as the 'face' of Green Belt Place."  ECF No. 45 at DSMF ¶¶ 100, 102.  The letter also stated that Ms. Carter "no longer [felt] comfortable going to Green Belt Place [sic] and having to be away from home three to four days every week knowing she is there for discriminatory reasons."  ECF No. 33, Ex. 43 at 4.  The letter covered several additional topics, including that Ms. Carter would not hesitate to litigate, but that she was willing to amicably separate from employment via a pre-litigation settlement.  ECF No. 45 at DSMF ¶ 101.  Eureka was shocked by the letter because Ms. Carter had not notified Ms. Jeter, Mr. Campos, or human resources that she felt offended, used, or discriminated against.  ECF No. 45 at DSMF ¶ 104.

Shortly after receiving Ms. Carter's letter, on November 1, 2021, Eureka placed Ms. Carter on paid leave and investigated her allegations.  ECF No. 45 at DSMF ¶ 105, PSMF ¶ 212.  The parties dispute whether placing Ms. Carter on paid leave was an adverse employment action.  ECF Nos. 31 at 3–4;  37 at 2–4.  Eureka then began investigating Ms. Carter's allegations, during which Director of Human Resources Ms. Jeni Sumbera interviewed multiple Eureka employees, including Ms. Jeter.  ECF No. 45 at DSMF ¶ 106.  Eureka's investigation revealed no discrimination and none of Eureka's employees reported witnessing discrimination or themselves experiencing discrimination.  ECF No. 45 at DSMF ¶ 113.  Instead, Eureka contends, and Ms. Carter disputes, that its investigation uncovered a series of serious performance issues with Ms. Carter.  ECF No. 45 at DSMF ¶ 114.

On December 15, 2021, Eureka terminated Ms. Carter.  ECF No. 45 at DSMF ¶ 120.  Ms. Jeter made the decision, with input from HR Director Sumbera.  ECF No. 45 at DSMF ¶ 120.  In its letter, Eureka stated that Ms. Carter's termination was warranted for job performance issues including but not limited to:  (1) failing to properly manage Greenbelt Place and other properties, (2) failing to report material changes in the conditions of those properties to management, and (3) concealing or failing to share material communications from government officials with Eureka's upper management.  ECF Nos. 45 at PSMF ¶ 236;  40, Ex. 47 at 4.

Eureka now moves for Summary Judgment on all of Ms. Carter's claims.  ECF No. 30. With briefing complete, the Motion is now ripe for adjudication.[3]

---

[3] The Court has jurisdiction over the Title VII and § 1981 claims, which raise federal questions, under 28 U.S.C. § 1331.

## II.    Legal Standard

To prevail on a motion for summary judgment, the moving party must establish that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A factual dispute is 'genuine' if the 'evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *Razak v. Uber Techs., Inc.*, 951 F.3d 137, 144 (3d Cir. 2020) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  "A factual dispute is 'material' if it 'might affect the outcome of the suit under the governing law.'"  *Id.* (quoting *Anderson*, 477 U.S. at 248).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial."  *NAACP v. N. Hudson Reg'l Fire & Rescue*, 665 F.3d 464, 475 (3d Cir. 2011) (alteration omitted) (quoting *Matsushita Elect. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The burden to establish that there is no genuine dispute as to any material fact "remains with the moving party regardless of which party would have the burden of persuasion at trial." *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1080 (3d Cir. 1996) (internal quotation marks omitted).  Furthermore, "[i]f the non-moving party bears the burden of persuasion at trial, 'the moving party may meet its burden on summary judgment by showing that the nonmoving party's evidence is insufficient to carry that burden.'"  *Kaucher v. Cnty. Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (quoting *Wetzel v. Tucker*, 139 F.3d 380, 383 n.2 (3d Cir. 1998)).

Once the moving party has carried its initial burden, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts…. Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  *Matsushita*, 475 U.S. at 586–87.  Thus, while "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his

favor," *Anderson*, 477 U.S. at 255, "Rule 56(e) . . . requires the nonmoving party to go beyond the pleadings" and point to "'specific facts showing that there is a genuine issue for trial,'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (citation omitted).  But, while the court must "view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor . . . to prevail on a motion for summary judgment, the non-moving party must present more than a mere scintilla of evidence…." *Burton v. Teleflex Inc.*, 707 F.3d 417, 425 (3d Cir. 2013) (internal citations omitted).  Instead, "there must be evidence on which the jury could reasonably find for the non-movant." *Id.* (cleaned up).

### III.    Discussion

Ms. Carter asserts that Eureka discriminated against her based on her race when it required her to focus exclusively on Greenbelt, placed her on paid leave, and terminated her employment. ECF No. 37.  She also claims that Eureka retaliated against her for engaging in protected activity, specifically, sending her October 29, 2021 letter.  *Id.*  Eureka responds that Ms. Carter cannot make out a prima facie case of race discrimination or retaliation, and even if she could, that she cannot show that Eureka's legitimate, non-discriminatory reasons for its actions were pretextual. ECF No. 31.  After a careful review of the parties' briefing, the relevant case law, and the parties' voluminous 237-page combined statement and counterstatement of material facts (ECF No. 45), the Court concludes that genuine issues of material fact remain for trial regarding the majority of Ms. Carter's claims.

### A.    Legal Framework

The familiar *McDonnell Douglas* burden-shifting framework applies to Ms. Carter's discrimination and retaliation claims under Title VII and Section 1981.  *McDonnell Douglas Corp.*

*v. Green*, 411 U.S. 792, 802–03 (1973);  *Burton*, 707 F.3d at 425–27;  *Williams v. Tech Mahindra (Americas) Inc.*, 70 F.4th 646, 651–52 (3d Cir. 2023).

The *McDonnell Douglas* analysis has three steps.  First, the plaintiff must point to evidence sufficient to satisfy the elements of a prima facie case of employment discrimination or retaliation, thereby creating an inference that her employer acted unlawfully.  *See Burton*, 707 F.3d at 426.  Next, the defendant must rebut this inference by articulating a legitimate, non-discriminatory reason for its actions.  *See id.*  The burden of production then shifts back to the plaintiff, who, in order to survive summary judgment, must provide evidence from which a jury could reasonably infer that the defendant's proffered explanation for its conduct is, in reality, pretext for unlawful discrimination or retaliation.  *See id.* at 426–27;  *see also Fuentes v. Perskie*, 32 F.3d 759, 763–64 (3d Cir. 1994) (setting forth burden shifting framework under *McDonnell Douglas* at summary judgment).  Although the *McDonnell Douglas* framework contemplates a shifting burden of *production*, the burden of *persuasion* always remains with the plaintiff.  *Smith v. City of Allentown*, 589 F.3d 684, 691 (3d Cir. 2009).

The Court will address Ms. Carter's disparate treatment claims and then turn to her retaliation claims.

### B.  Defendant is Not Entitled to Summary Judgment on the Majority of Ms. Carter's Disparate Treatment Claims

Ms. Carter contends that Eureka discriminated against her on the basis of her race when it required her to focus exclusively on Greenbelt, placed her on paid leave, and terminated her.  ECF No. 1.  For the reasons set forth below, the Court finds that summary judgment is not appropriate with respect to the required focus on Greenbelt and Ms. Carter's termination, but that summary judgment should be granted for Eureka regarding Ms. Carter's paid leave.

1. **Ms. Carter has Established a Prima Facie Case Regarding her Focus on Greenbelt and her Termination**

The Court finds that Ms. Carter has made out a prima facie case of race discrimination relating to her exclusive focus on Greenbelt and her termination, but not for her paid leave. To prove a prima facie case of employment discrimination, a plaintiff must show that (1) she is a member of a protected class, (2) that she was qualified for the position she sought to attain or retain, (3) that she suffered an adverse employment action, and (4) the action occurred under circumstances that support an inference of intentional discrimination. *Qin v. Vertex, Inc.*, No. 23-1031, 2024 WL 1920379, at *8 (3d Cir. May 2, 2024). Eureka contests elements two through four. ECF No. 31 at 2–5.

With respect to Eureka's challenge to element two, the Court finds that Ms. Carter was qualified for her position as regional property manager. Eureka's argument to the contrary improperly focuses on whether, in its view, she performed her job well. ECF No. 31 at 2. But to meet this element, all Ms. Carter must show is that she "possessed the necessary training and experience for the job for which [s]he was discharged." *Simpson v. Prince Telecom, LLC*, No. 14-1211, 2017 WL 1206403, at *11 (D. Del. 2017). "Issues of . . . poor performance and misconduct are more logically raised to rebut Plaintiff's prima facie case." *Id.* (citing cases). While Eureka might believe, in retrospect, that Ms. Carter was not qualified to be a Regional Sales Manager, the record shows that she possessed the basic qualifications for the job at the time she was hired.[4]

---

[4] In support of its assertion that Ms. Carter was not qualified for her position, Eureka also cites *Makky v. Chertoff*, 541 F.3d 205, 215 (3d Cir. 2008). This case, however, is distinguishable. First, in *Makky*, the plaintiff's discrimination claims arose in a mixed-motive case which applies a different framework than the *McDonnell Douglas* burden shifting framework applicable here. *Makky*, 541 F.3d at 215. Additionally, in *Makky*, the Court explained that it does not consider whether plaintiffs were "subjectively qualified for their jobs, i.e., performed their jobs well;" instead, it looks only at whether plaintiffs meet "an absolute minimum requirement of qualification, best characterized in those circumstances that require a license or a similar prerequisite in order to perform the job." *Id.* at 215–16. Here, because Eureka argues that Ms. Carter was not subjectively qualified for her position because she failed to perform her job well—not because she lacked a license or other prerequisite—*Makky* is inapplicable.

Accordingly, the Court finds that Ms. Carter has satisfied the second element of her prima facie case.

Regarding element three of her prima facie case, Ms. Carter points to three potential adverse actions: the October 22, 2021 requirement that she exclusively focus on Greenbelt; her November 1, 2021 placement on paid leave; and her December 15, 2021 termination. ECF No. 1 ¶ 26. The parties do not dispute that her termination constituted an adverse action. ECF No. 31 at 5. As to Ms. Carter's required focus on Greenbelt, the parties agree that she suffered no change in title, pay, or benefits. ECF No. 45 at DSMF ¶ 95. But Ms. Carter contends that the focus on Greenbelt altered the terms and conditions of her employment because, inter alia, (1) she was required to be present at Greenbelt four days a week, and her commute would be a 3.5 hour drive each way, and (2) in her view, she was "stripped of her five remaining properties" and they were "given to Rebecca Kuchta," which Eureka disputes. ECF No. 45 at DSMF ¶ 95, PSMF ¶ 163. Ms. Carter acknowledges that her job always included the requirement to periodically visit her properties. ECF No. 45 at PSMF ¶¶ 158–162. But viewing the facts in the light most favorable to Ms. Carter, the dispute over whether her exclusive focus on Greenbelt was permanent or temporary, substantially increased her commute, or altered her duties in a way that changed her employment terms, provides sufficient evidence for a reasonable juror to conclude that Ms. Carter suffered an adverse employment action. *See Muldrow v. City of St. Louis, Mo.*, 144 S.Ct. 967, 974 (2024) (explaining that an adverse employment action means "treat worse," but the worse treatment need not be "significant" or "serious, or substantial, or any similar adjective suggesting that the disadvantage to the employee must exceed a heightened bar.").

The parties also dispute whether Ms. Carter's paid leave constituted an adverse action. The Court agrees with Eureka that placing Ms. Carter on paid leave after receiving her October 29,

2021 letter was not an adverse employment action.  *See Jones v. Se. Pa. Transp. Auth.*, 796 F.3d 322, 326 (3d Cir. 2015) (collecting cases) (Third Circuit joining "chorus" of other Courts of Appeal in finding that suspension with pay pending investigation not adverse employment action).  Cases finding that suspensions with pay can constitute adverse actions involved "something more," such as a required medical evaluation, or the employee being required to sign a performance improvement plan without a union representative.  *See Russo v. Bryn Mawr Trust Co.*, Civil Action No. 19-2408, 2022 WL 15535045, *6 (E.D. Pa. Oct. 27, 2022).  Those circumstances are not present here.  Rather, Eureka placed Ms. Carter on paid leave and investigated the allegations in her October 29, 2021 letter.  ECF No. 45, DSMF ¶ 105.  Accordingly, the Court finds that Eureka's decision to place Ms. Carter on paid leave is not an adverse employment action, and Ms. Carter cannot make out a prima facie case of race discrimination based on that event.

Turning to the fourth element of Ms. Carter's prima facie case, to show circumstances supporting an inference of intentional discrimination, a Plaintiff may either:

> (1) introduce evidence of comparators (i.e., similarly situated employees who (a) were not members of the same protected class and (b) were treated more favorably under similar circumstances); or (2) rely on circumstantial evidence that otherwise shows a causal nexus between [her] membership in a protected class and the adverse employment action.

*Drummer v. Hosp. Univ. Pa.*, 455 F. Supp. 3d. 160, 168 (E.D. Pa. 2020) (citing *Greene v. V.I. Water & Power Auth.*, 557 F. App'x 189, 195 (3d Cir. 2014)).  Here, Ms. Carter proceeds via both methods.  She cannot, however, satisfy this element via comparator evidence, because her three identified purported comparators, Stephanie Jeter, Jessica Incorvaia, and Rebecca Kuchta, *see* ECF No. 45 at DSMF ¶ 133, are not similar in all relevant respects, *see Durst v. City of Phila.*, 798 Fed. Appx. 710, 713 (3d Cir. 2020).  For example, alleged comparator Stephanie Jeter, who held the title of Vice President of Affordable Housing, *supervised* Ms. Carter and the other Regional

12

Property Managers within the Affordable Housing portfolio.  ECF No. 45 at DSMF ¶¶ 27, 29, 64.  Alleged comparator Jessica Incorvaia held the positions of Assistant Property Manager, and as of September 6, 2021, Property Manager, and was supervised *by* Ms. Carter.  ECF No. 45 at DSMF ¶ 42.  Therefore, Ms. Jeter and Ms. Incorvaia cannot be comparators because they are not similar to Ms. Carter in all relevant aspects, including their job titles and who supervised them.  *See McGinnis v. Donahoe*, No. 2:12-1880, 2015 WL 507043, at *8 (W.D. Pa. Feb. 6, 2015) (Conti, J.) (explaining that employees cannot be similarly situated to their supervisors).

Alleged comparator Rebecca Kuchta is also not similarly situated to Ms. Carter because she had different job responsibilities and did not engage in similar misconduct.  First, Ms. Kuchta was hired as a Floating Regional Property Manager—instead of a permanent Regional Property Manager like Ms. Carter—and began work less than one week before Ms. Carter was placed on leave.  ECF No. 45 at DMSF ¶¶ 76–78, 94.  Further, Ms. Kuchta is not similarly situated to Ms. Carter because she did not engage in the same alleged misconduct:  namely, she did not have properties fail REAC inspections.  *See generally* ECF No. 45.  Here, Ms. Carter had four of her properties fail REAC inspections, whereas Ms. Kuchta had none;  indeed, Ms. Kuchta was hired in the wake of that conduct by Ms. Carter.  ECF No. 45 at DMSF ¶¶ 43, 71, 94;  *Durst*, 798 Fed. App'x at 713 (finding that comparator was not similarly situated where their alleged misconduct was not similar to that of plaintiff's);  *Dennison v. Ind. Univ. Pa.*, No. 20-cv-1563, 2022 WL 3213657, at *9 (W.D. Pa. Aug. 9, 2022) (Horan, J.) (explaining that comparators must be "sufficiently comparable," and they are not so when the facts and circumstances leading to the discipline are different for the comparators).  Accordingly, Ms. Carter cannot satisfy the fourth element of her prima facie case using comparator evidence.

Ms. Carter also asserts, however, that she can show circumstances giving rise to an inference of discrimination sufficient to satisfy the fourth element of her prima facie case. It is appropriate, as Ms. Carter notes, for a plaintiff to proffer the same evidence for the fourth element of her prima facie case as she does to establish pretext. *See Burton v. Teleflex Inc.*, 707 F.3d 417, 427 (3d Cir. 2013) (explaining that to survive summary judgment, plaintiff need not provide additional evidence beyond her prima facie case where such evidence permits a reasonable factfinder to discredit the employer's proffered justification); *McFadden v. Whole Foods Market Group, Inc.*, No. 19-1103, 2021 WL 736899, at *9 (E.D. Pa. Feb. 25, 2021) (finding that plaintiff made a prima facie case of discrimination where he also "produced enough evidence that a jury could find that [defendant's] proffered reasons are pretextual…"). Here, regarding her required focus on Greenbelt and her termination, Ms. Carter contends she can satisfy the fourth element of her prima facie case based on the comparator evidence as well as "evidence of discriminatory statements" by Mr. Campos and Ms. Jeter. ECF No. 37 at 6. The Court agrees that Ms. Carter as satisfied this element but will reserve its discussion for the pretext section below.

## 2.      Material Issues of Fact Remain for Trial Regarding Pretext

Initially, the Court finds, and Ms. Carter does not dispute, that Eureka has proffered several legitimate, non-discriminatory reasons for requiring her to focus on Greenbelt and terminating her: namely, that Eureka was required to have a full-time onsite representative at Greenbelt and Ms. Carter was most familiar with that property; and that Ms. Carter mismanaged the properties, lied about visiting them, and instructed her staff to violate HUD regulations. ECF No. 31 at 7–10. Viewing the evidence in the light most favorable to Ms. Carter, however, the Court finds that there are material issues of fact for trial regarding whether Eureka's proffered reasons were a pretext for race discrimination.

### a. Legal Standard for Pretext

To show an employer's proffered reasons for an adverse employment action were a pretext for discrimination, a plaintiff must offer some direct or circumstantial evidence from which a factfinder could reasonably (i) disbelieve the employer's stated reasons for the action, or (ii) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action. *In re Tribune Media Co.*, 902 F.3d at 402; *Fuentes*, 32 F.3d at 764. To meet her burden under the first method, Ms. Carter's evidence "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Burton*, 707 F.3d at 427 (quoting *Fuentes*, 32 F.3d at 765). "To discredit the employer's proffered reason, however, the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." *Fuentes*, 32 F. 3d at 765. The second method of proving pretext requires the plaintiff to produce evidence that could cause a factfinder to believe that a discriminatory reason was more likely than not a determinative factor for its adverse employment action. *Qin*, 2024 WL 1920379, at *10. One way a plaintiff can make this showing is where "the employer treated other… similarly situated persons not of [her] protected class more favorably." *In re Tribune Media Co.*, 902 F.3d at 403.

### b. A Rational Juror Could Find that Ms. Carter's Required Focus on Greenbelt was Pretextual

Here, a rational juror could conclude that Eureka's reasons for requiring Ms. Carter to focus exclusively on Greenbelt were pretextual. Ms. Carter contends that she was required to focus on Greenbelt because of her race. ECF No. 38 at 6–12. In support, she points to Ms. Jeter's October

7 and 14, 2021 statements that Ms. Carter would need to be the "face" of Greenbelt.  ECF No. 45 at DSMF ¶¶ 57, 79.  The parties agree that the residents of Ms. Carter's properties, including Greenbelt, were predominately Black.  ECF No. 45 at DSMF ¶ 136.  And Ms. Carter understood Ms. Jeter's comments to mean "that because of Eureka being a Caucasian company that was not caring about the way these African-American residents were living [at Greenbelt] they [Eureka] needed me [Carter] to be the face of the property.  They needed to have a token black person to be front and center for it.  That's what I understood, so I immediately took offense to it.  I did."  ECF No. 45 at PSMF ¶ 172.  Eureka disputes that Ms. Carter was asked to focus on Greenbelt because of her race, and counters that she was asked to do so because she had spent most of her time there, was the most familiar with Greenbelt out of all her properties, and had relationships with the community members and staff.  ECF No. 45 at PSMF ¶ 172.  With respect to Ms. Jeter's comments, Eureka posits that, if Ms. Jeter made these comments, which she does not recall doing, they were "in the term that [Eureka] needed to have a consistent senior management leader at Greenbelt for the purposes of stabilizing the property."  ECF No. 45 at DSMF ¶ 108.  The Court finds both parties' interpretations to be reasonable, and in light of the dispute, a jury must decide the issue.[5]

---

[5] To the extent Ms. Carter's pretext argument for her focus on Greenbelt includes that her purported three Caucasian comparators were "more qualified" to oversee Greenbelt, *see* ECF No. 37 at 8–9, the Court is not persuaded by this argument.  First, the Court has previously held that Ms. Carter's three proposed comparators are not similarly situated to her.  Second, even if they were, her view as to who is "more qualified" is veering into the area of Eureka's business judgment and does not support her pretext argument.  *Rabinowitz v. AmeriGas Partners, L.P.*, 252 Fed. App'x 524, 528 (3d Cir. 2007) ("[I]t is well-settled that a plaintiff may not defeat summary judgment merely by questioning the business judgment behind an employer's decision…").  Nevertheless, viewing the record as a whole, and in light of Mr. Campos' and Ms. Jeter's comments, the Court concludes that Ms. Carter has presented sufficient evidence for a rational juror to conclude that her race was a motivating or determinative factor in her required exclusive focus on Greenbelt.

>           c.      **A Rational Juror Could Find that Ms. Carter's Termination
>                    was Pretextual**

The Court finds that a rational juror could conclude that Eureka's reasons for terminating Ms. Carter were pretextual. Ms. Carter asserts that Eureka's reasons were inconsistent and shifted over time. ECF No. 37 at 7. Specifically, she asserts that when Eureka terminated her on December 15, 2021, it gave only three reasons, but then it added to and changed its reasons during this litigation. ECF No. 37 at 6–12; ECF No. 40, Ex. 47 at 4; ECF No. 45 at PSMF ¶¶ 235–240. Eureka responds that it terminated Ms. Carter for multiple reasons, but they all boil down to one common element: that Ms. Carter "grossly mismanaged her properties." ECF No. 31 at 9; ECF No. 45 at PSFM ¶¶ 235–240; ECF No. 46 at 3. Eureka asserts that this broader statement incorporates all the specific reasons for termination it has asserted at various points in this case, and consequently, its reasons have not been shifting or inconsistent. *Id.* Ms. Carter retorts that, in addition to Eureka's shifting reasons, its main reason is not believable: namely, she did not mismanage her properties, but rather, she inherited the properties in bad shape due to years of neglect, and although she took steps to improve them, Eureka did not provide her with sufficient support. ECF No. 37 at 6–12; ECF No. 45 at DSMF ¶¶ 24, 31–38, 43, 53, 60.

The Third Circuit has said that if a plaintiff shows that the reasons given for her termination were not consistent throughout the proceedings, that evidence may "tend[] to show pretext, though of course it should be considered in light of the entire record." *Abramson v. William Paterson Coll. of N.J.*, 260 F.3d 265, 284 (3d Cir. 2001). When considering the full record, a court must determine whether the plaintiff's evidence "contradicts the core facts put forward by the employer as the legitimate reason for its decision," such that a reasonable juror could infer that the employer did not act for the non-discriminatory reason provided. *Tomasso v. Boeing*, 445 F.3d 702, 706 (3d Cir. 2006).

The parties do not dispute that in its letter terminating Ms. Carter, Eureka stated that Ms. Carter's termination was warranted for job performance issues including but not limited to:  (1) failing to properly manage Greenbelt Place and other properties, (2) failing to report material changes in the conditions of those properties to management, and (3) concealing or failing to share material communications from government officials with Eureka's upper management.  ECF Nos. 45 at PSMF ¶ 236;  40, Ex. 47 at 3.  Ms. Carter contends that during the litigation, however, Eureka has added six or seven additional reasons, including that Ms. Carter failed to immediately appeal her properties' REAC inspection scores, and that she was employed at another company while working for Eureka.  ECF No. 45 at PSFM ¶¶ 235–240.

Here, even assuming that any variations in Eureka's reasons for the termination relate to Ms. Carter's mismanagement of her properties, she has presented sufficient evidence contradicting several core facts underlying Eureka's reasons for termination to present the question of pretext to the jury.  For example, Eureka admits that when Ms. Carter began her employment with Eureka, her initial reaction to the Greenbelt property was that it was in "bad shape," had numerous issues including glass all over the grounds, balconies falling down, windows missing glass, marijuana plants growing on the property, and people whom she assumed to be drug dealers on the property. ECF 45 at PSMF ¶¶ 7, 8, 13.  At that time, she assessed the overall condition of Greenbelt as poor. ECF 45 at PSMF ¶ 9.  The parties also agree that there was at least a six-month back log of work orders for repairs at Greenbelt.  ECF No. 45 at PSMF ¶ 11.  Eureka admits that it was aware of the property issues at Greenbelt before Ms. Carter started working for Eureka.  ECF No. 45 at PSMF ¶ 16.  Eureka also admits that Ms. Carter spent extensive time at the Greenbelt property during her employment.  ECF No. 45 at PSMF ¶ 22.  Eureka further concedes that Ms. Carter took a number of steps at Greenbelt, including, for example:  (a) early in her employment, instructing Property

Managers at each property to do annual housekeeping inspections to ensure safe and sanitary conditions, perform maintenance checks, and complete all work orders to ensure the properties would pass their REAC inspections, ECF No. 45 at PSMF ¶ 27;  (b) instructing at least one staff member to remove grass growing on fences and buildings, paint hallway floors where possible, secure hallway rails, replace broken or missing light fixtures in hallways, and remove chalk from building exteriors, ECF No. 45 at PSMF ¶ 29;  (c) arranging for bed bug treatment, installing fire extinguishers, and making repairs to stairs, walls, ceilings, windows, and HVAC units, ECF No. 45 at PSMF ¶ 30.  Eureka admits that it was aware of staffing issues at Greenbelt.  ECF No. 45 at PSMF ¶ 46.

But the parties disagree as to the significance of those steps.  Ms. Carter contends they show she did "everything she could" to improve the state of Greenbelt, ECF No. 37 at 8–11, whereas Eureka asserts those are simply tasks that are part of her job responsibilities, that she was hired specifically to improve the conditions at Greenbelt so that it would pass its REAC inspections, and that she instead mismanaged Greenbelt and her other properties, ECF No. 31 at 9–11.  In her counterstatement of facts, Ms. Carter recounts, at length, steps she took that she believes shows she properly managed her properties, and that she believes establish that she inherited the properties in deficient states.  *See, e.g.*, ECF No. 45 at PSMF ¶¶ 78–155.  Eureka disputes a substantial number of these factual statements.  *Id.*  Similarly, Ms. Carter contends that Eureka was aware of the issues at her properties before October 2021.  ECF No. 45 at PSMF ¶¶ 16, 23, 24, 46, 201, 202.  Eureka admits that it was aware of some issues at some of Ms. Carter's properties before October 2021, but disputes that it knew the full extent of the issues at all of Ms. Carter's properties until after October 2021 when Ms. Carter failed all four of her REAC inspections.  ECF No. 45 at PSMF ¶¶ 201, 202.

In summary, the parties' dueling narratives regarding the core facts underlying Eureka's reasons for terminating Ms. Carter demonstrate that there are material factual issues for the jury to determine regarding pretext.

### C.    Eureka is Not Entitled to Summary Judgment on Ms. Carter's Retaliation Claims

Ms. Carter contends that, after she sent the October 29, 2021 letter complaining of race discrimination, Eureka retaliated against her by placing her on paid leave on November 1, 2021, and then terminating her on December 15, 2021.  ECF No. 1 ¶¶ 28–34.  In its Motion, Eureka asserts that Ms. Carter cannot establish a prima facie case of retaliation, and even if she could, she cannot establish pretext.  ECF No. 31 at 12–16.  For the reasons set forth below, the Court finds that summary judgment is not appropriate on Ms. Carter's retaliation claims.

### 1.    Ms. Carter has Established a Prima Face Case of Retaliation

To establish a prima facie case for retaliation, a plaintiff must show that (a) she engaged in a protected activity, (b) the employer took materially adverse action against her, and (c) there was a causal connection between the protected activity and the employer's action.  *Young v. City of Phila. Police Dept.*, 651 F. App'x 90, 95 (3d Cir. 2016) (citing *Moore v. City of Phila.*, 461 F.3d 331, 340–42 (3d Cir. 2006)).  Eureka challenges the first and third elements of Ms. Carter's prima facie case.  ECF No. 31 at 12.

Regarding the first element, the Court finds that Ms. Carter established sufficient information showing that she engaged in protected activity by filing her complaint.  "[O]nly complaints about discrimination prohibited by Title VII—discrimination based on race, color, religion, sex, or national origin—constitute protected activity."  *Qin*, 2024 WL 1920379, at *27.  Protected activity includes "informal protests of discriminatory employment practices, including making complaints to management," so long as they are not equivocal or vague.  *Moore*, 461 F.3d

at 341–43.  Further, "the employee must hold an objectively reasonable belief, in good faith, that the activity they oppose is unlawful under Title VII."  *Id.* at 341 (citing *Clark Cty. v. Breeden*, 532 U.S. 268, 271 (2001) (rejecting retaliation claim where "[n]o reasonable person could have believed that" the underlying incident complaint about violated Title VII)).

Ms. Carter contends that her October 29, 2021 letter is protected activity because she unequivocally asserts that she "has been subjected to race discrimination in violation of Title VII." ECF No. 33, Ex. 43 at 2;  ECF No. 37 at 16;  ECF No. 45 at PSMF ¶¶ 183–89.  Eureka acknowledges receiving the letter but asserts that it is not protected activity because it was not based on a good faith, objectively reasonable belief that Eureka's employment actions were unlawful.  ECF Nos. 31 at 16;  45 at DSMF ¶¶ 100–04.  Because the Court previously concluded that a reasonable juror could find that Ms. Jeter's comments about Ms. Carter being the "face" of Greenbelt are based on her race, the Court finds that her assertion of race discrimination in her October 29, 2021 letter was based on a good faith, objectively reasonable belief that she was being discriminated against based on her race.  Therefore, she has satisfied this element of her prima facie case.

With respect to the second element of her prima facie case of retaliation, Ms. Carter points to two adverse actions:  being placed on paid leave and being terminated.  ECF No. 37 at 18.  For the retaliation claim, Eureka does not contest that that these acts constitute adverse employment actions.  ECF No. 31 at 12, 15.

The third element of Ms. Carter's prima facie case requires her to show a causal connection between her protected activity and her placement on paid leave and termination.  To do so at this stage, she may rely on a "broad array of evidence," including temporal proximity, a pattern of antagonism, inconsistent explanations for the adverse action, or other similar circumstantial

evidence.  *Carvalho-Grievious v. Del. State Univ.*, 851 F. 3d. 249, 260 (3d Cir. 2017).  If the temporal proximity between the protected activity and the adverse action is "unusually suggestive," then it is sufficient to create an inference of causality.  *Qin*, 2024 WL 1920379, at *11.

Here, the Court finds that the timing of Ms. Carter being placed on paid leave, the next business day after her letter, is unusually suggestive and creates an inference of causality for that adverse action.  The timing of Ms. Carter's termination on December 15, 2021, however, is not unusually suggestive.  But Ms. Carter points to other aspects of the record to support a causal link between her letter and her termination.  Specifically, she contends that the evidence she presented to show pretext also supports the causal link for her prima facie case of retaliation.  ECF No. 37 at 17.  As the Court did in connection with Ms. Carter's disparate treatment claim, it will reserve discussion of this evidence for the pretext section below.

### 2.   Material Issues of Fact Remain for Trial Regarding Pretext

The Court finds, and Ms. Carter does not dispute, that Eureka has proffered several legitimate, non-retaliatory reasons for placing her on paid leave and terminating her:  namely, that Eureka placed Ms. Carter on paid leave to investigate her claims and protect her from further acts of discrimination;  and that Eureka terminated Ms. Carter's employment because she mismanaged her properties.  ECF No. 31 at 16–17.  Ms. Carter, however, asserts that Eureka's proffered reasons are a pretext for retaliation.  ECF No. 37 at 25–28.  In viewing the evidence in the light most favorable to Ms. Carter, the Court finds that there are material issues of fact for trial regarding whether Eureka's proffered reasons were a pretext for race discrimination.

### a.    Legal Standard for Pretext

To show an employer's proffered reasons for an adverse employment action were a pretext for retaliation, a plaintiff must prove that "retaliatory animus was the 'but-for' cause of the adverse employment action." *See University of Texas Southwest Medical Center v. Nassar*, 570 U.S. 338 (2013); *Carvahlo*, 851 F.3d 249, 258 (explaining that a plaintiff asserting a retaliation claim "has a higher causal burden" than a plaintiff asserting a discrimination claim under Title VII). A plaintiff establishes but-for causation where she shows "that the harm would not have occurred in the absence of—that is, but for—the defendant's conduct." *Carvahlo*, 851 F.3d at 258. To meet her burden, a plaintiff's evidence "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Burton*, 707 F.3d at 427 (quoting *Fuentes*, 32 F.3d at 765); *Carvahlo*, 851 F.3d at 262. A defendant, however, "cannot avoid liability just by citing some *other* factor that contributed to its challenged employment decision," so long as the plaintiff's race was "one but-for cause of that decision." *Bostock v. Clayton Cty., Georgia*, 590 U.S. 644, 656 (2020).

### b.    A Rational Juror Could Find that the Reasons for Placing Ms. Carter on Paid Leave and Terminating Her Are a Pretext for Retaliation

Here, Ms. Carter argues that Eureka's proffered reasons for placing her on paid leave and terminating her are a pretext for retaliation. ECF No. 37 at 25–28. In support, and as noted above, Ms. Carter alleges that Eureka's proffered reasons are false and have been changing throughout the litigation. ECF No. 37 at 26; ECF No. 45 at PSMF ¶¶ 235–240. In response, Eureka asserts that its reasons are not inconsistent because they all relate to Ms. Carter's mismanagement of her properties. ECF No. 31 at 9; ECF No. 45 at PSMF ¶¶ 235–240; ECF No. 46 at 3.

With respect to Ms. Carter's placement on paid leave, Eureka first contends that such a placement was not pretextual because, in her October 29, 2021 letter, Ms. Carter states that she "no longer feels comfortable going to Green Belt Place [sic]."  ECF No. 31 at 25–26;  ECF No. 33, Ex. 43 at 4;  ECF No. 45 at DSMF ¶ 103.  Therefore, Eureka avers that it was not retaliating against Ms. Carter when it placed her on paid leave but was responding to her own request not to work onsite.  *Id.*  In response, Ms. Carter avers that Eureka is misquoting her letter which said she did not feel comfortable going to Greenbelt Place while being "away from home three to four days every week knowing she is there for discriminatory reasons."  ECF No. 33, Ex. 43 at 4;  ECF No. 45 at DSMF ¶ 103, PSMF ¶ 187.  Indeed, Ms. Carter contends, and Eureka disputes, that she continued to work even after sending her October 29, 2021 letter.  ECF No. 45 at PSMF ¶ 189.

Eureka further argues that placing Ms. Carter on paid leave was not retaliatory as it allowed them to investigate her allegations in the letter without subjecting her to the risk of additional exposure to discrimination.  ECF No. 31 at 27–28;  ECF No. 45 at DSMF ¶¶ 105–113.  In response, Ms. Carter contends that Eureka only placed her on leave in order to investigate her and find cause to terminate her.  ECF No. 37 at 26.  As evidence, Ms. Carter notes that she was placed on paid leave immediately after sending her October 29, 2021 letter.  ECF No. 45 at DSMF ¶¶ 100, 102, 105, PSMF ¶ 212.  As further evidence of retaliatory motive, Ms. Carter points out that Eureka placed her on paid leave despite Greenbelt Place being in "crisis" and Ms. Carter allegedly being the best-suited person to fix the property.  ECF No. 45 at PSMF ¶ 213.  Given the significant factual disputes, and taking the facts in the light most favorable to Ms. Carter, the Court finds that a reasonable juror could conclude that placing Ms. Carter on paid leave was retaliation for Ms. Carter's October 29, 2021 letter, and but for sending this letter, Ms. Carter would not have been placed on paid leave.

With respect to Ms. Carter's termination, Eureka contends that Ms. Carter would have been terminated regardless of whether she sent the October 29, 2021 letter because she failed to adequately manage her properties.  ECF No. 31 at 24–25;  ECF No. 45 at DSMF ¶¶ 31, 33, 35, 36, 38, 43, 51, 53, 60.  Eureka also points out that, prior to receiving Ms. Carter's letter, it considered terminating her employment because of her "overwhelming poor performance across all of her properties."  ECF No. 45 at DSMF ¶ 60.  Ms. Carter counters that Eureka's reasons are false because she did not cause the poor conditions at her properties;  instead, she inherited them this way and did not have sufficient time or support to fix them.  ECF No. 45 at DSMF ¶¶ 24, 31, 33, 35, 36, 38, 43, 53, 60.  Further, she contends that her termination was a form of retaliation because Eureka was aware of the properties' conditions and failed REAC inspections prior to her October 29, 2021 letter, but Eureka did not terminate her until after receiving the letter.  ECF No. 45 at DSMF ¶¶ 201, 202.  Ms. Carter adds, and Eureka disputes, that even though Eureka was aware of the problems with Greenbelt Place prior to her letter, she was never written-up, disciplined, or told her job was in jeopardy;  instead, she alleges she received praise for her job performance on multiple occasions.  ECF No. 45 at DSMF ¶¶ 214–218.

Given the numerous and significant factual disputes between the parties as to whether Ms. Carter mismanaged her properties and whether she was terminated due to that mismanagement or in retaliation for her October 29, 2021 letter, and viewing the facts in the light most favorable to Ms. Carter, the Court cannot conclude that the termination would have occurred regardless of her letter.  In making this determination, we look at the entire record, and it is appropriate for us to consider whether employment-related issues are documented prior to the protected activity.  *LeBoon*, 503 F.3d at 232–34.  Here, although Ms. Carter's properties had failed their REAC investigations prior to her letter, the record reflects that Eureka did not terminate Ms. Carter until

after it received her letter.  Accordingly, Ms. Carter has presented sufficient facts from which a jury could find that Ms. Carter would not have been terminated but for sending this letter.

Therefore, because Ms. Carter has proffered sufficient evidence from which a reasonable juror could conclude that Eureka's reasons for placing Ms. Carter on paid leave and terminating her were a pretext for retaliation, the Court will deny summary judgment.

## IV.     Conclusion

For the foregoing reasons, Defendant Eureka's Motion for Summary Judgment will be GRANTED IN PART AND DENIED IN PART, as set forth in the attached Order.

DATED this 3rd day of June, 2024.

BY THE COURT:

/s/ Christy Criswell Wiegand
CHRISTY CRISWELL WIEGAND
United States District Judge

cc (via ECF email notification):

All Counsel of Record